According to law, God save the United States dishonorable court. Good afternoon. Thank you for attending this zoom hearing. I'm very sorry that we weren't able to accommodate you in New Orleans this week. As it turns out, one panel of our court is having some arguments. But since you were the only panel on which both attorneys signaled your willingness to show up, we didn't think it made sense for us all to troop down there for that purpose. But things are going to change pretty soon, I think. So that's something. We do have a couple of adjustments or extra rules of the road for purposes of zoom hearings. One is we ask you to silence any other devices you have or those of people in the room with you. Second one is that we still do the audio recordings of the sitting, but we will not. As in New Orleans, you're not allowed to video or audio them for yourselves. If you like, we will give you five minutes uninterrupted time at the beginning of your presentation, just because there's always a little bit of a gap in communication here. And then the other thing I would say is we will appreciate in both of your cases record citations. We have a time clock system. The yellow light will tell you that you have two minutes left. And when the red light signals, we ask you to conclude unless you're answering a question from the court. The sole case this afternoon is number 220416, Polyflow versus Specialty RTP. And we'll hear from Mrs. Stratton to begin. Thank you, Judge Jones, and may it please the court. The party's contract says that any action arising out of the agreement must be arbitrated. In this action, Polyflow alleges that appellees breached the agreement, giving rise to various contract and tort claims. But the district court denied Polyflow's arbitration request. This court should reverse for two reasons. First, because the parties undisputedly have an arbitration agreement, the law heavily presumes that Polyflow's action is arbitrable. To deny arbitration, this court must have positive assurance that the arbitration agreement cannot be read to cover this action. There is at least no such positive assurance here. Second, appellees merits defenses and procedural arbitrability challenge are for the arbitrator to decide and thus may not preclude arbitration. To begin, the scope of the arbitration agreement here is reasonably construed to cover this entire action. The settlement agreement requires arbitration of any action that arises out of the agreement. The plain meaning of action is lawsuit, the entire civil proceeding. So the parties agreed to arbitrate the entire civil proceeding if it arises out of the settlement agreement. And this lawsuit qualifies. First, this lawsuit exists because of the settlement agreement. And the first page of Polyflow's complaint at 1189 of the record on appeal makes that clear, stating that Polyflow is bringing this action because the parties entered a settlement agreement, but appellees have not complied with it and never intended to comply. Second, this lawsuit includes claims that appellees concede arise out of the agreement, specifically Polyflow's claim and appellees counterclaim for breach of the agreement. So because this action unequivocally includes claims that arise out of the settlement agreement, and indeed, the lawsuit only exists because there is a settlement agreement that we allege has been breached, the action arises out of the agreement. And the plain language of the arbitration clause thus requires arbitration of the entire lawsuit. And this court employed that reasoning in its 2019 decision in Archer, which we've cited to the court as supplemental authority. The Archer panel focused on the plain meaning of the term action, which meant the entire lawsuit, not just individually qualifying claims. And it refused to rewrite the arbitration agreement there to encompass only individually qualifying claims. And I think it's important to note that the reasoning that Archer used applies with even more force in this case, because there, Archer involved an exclusion from arbitration. So the plain meaning of action, the exclusionary language had to be enough to overcome a presumption in favor of arbitration. Here, the plain meaning of any action governs what is included in arbitration. So in this case, the contract's plain language and the presumption in favor of arbitration are rowing in the same direction. Now, appellees have contended that the settlement agreement deviates from the plain meaning of action and specially defines action to more narrowly mean only claim. But the contract does not support that argument. You can see the settlement agreement at tab four of our record excerpts. And if you look in subsection A on the very first page, you'll see that the settlement agreement does not define the term action. So under ordinary contract interpretation principles, the plain language of the term should govern lawsuit, entire civil proceeding. What the settlement agreement does define at A1 is the term claim. And it defines it because it's going to use that term to describe what is being released by the parties in this settlement agreement and released. So it defines claim expansively to include not only claims, but also when the settlement agreement uses the word claim, it means to incorporate a more expansive meaning. It does not mean that when the settlement agreement uses the word action as it does in this arbitration agreement, but the parties intended to more narrowly constrict the plain meaning of that term to mean only claim. And in fact, your honors, A1 of the settlement agreement that defines claim shows the parties understood that there is a difference between the word action and the word claim because they define claims to include claims, actions, and causes of action, showing that they understand the difference. So we contend with the support of Archer and other authorities that this any action clause is unambiguous and the entire lawsuit must be arbitrated. But that is at least a reasonable interpretation of the arbitration agreement. And so in that case, the standard for denying arbitration is not met because this court can have no positive assurance that this agreement is incapable of being read to cover this action. I'd like to turn now, unless the court has questions about the scope of the arbitration clause to appellees asserted defenses. Let me ask you one question. When you say arbitration clause, the settlement agreement has two paragraphs discussing arbitration. Are you referring to B5C or C4? Or how are we supposed to interpret those provisions together? C4 is the clause that I'm referring to. And Polly's position is that based on the text and context of the settlement agreement, that C4 is the arbitration clause. B5C is essentially belt and suspenders. It's additional language that also underscores the broad intent of the parties to arbitrate a broad range of disputes. And so when I am referring to the arbitration agreement, I'm referring to C4. But B5C, as we've argued in our brief, is further support for the argument that there's no positive assurance that the parties agreed to exclude any of the claims in this action. Okay, thanks. I'll turn now to defenses. This court should hold that the issues of release, prior material breach, and lack of mediation are for the arbitrator to decide. This court's inquiry, when faced with a request for arbitration, is very limited. The court does not address the merits, but asks only whether an arbitration agreement exists and whether the subject matter of the dispute is within its scope. Where the existence of the contract is not an issue, as here, the only defenses a court may consider are those that specifically relate to the making of the arbitration agreement itself. Defenses that apply to the continuing enforcement of the contract as a whole are for the arbitrator to decide as part of the merits of the underlying dispute. This court has held that repeatedly in Primerica, in Bank One, in Willdrill, and the Supreme Court has held the same in PrimaPaint. Here, Appelli's defenses that PolyFlow has sued on released claims, or that PolyFlow has committed a prior material breach of the settlement agreement by firing the neutral pipe expert, these are not independent attacks that solely relate to the arbitration agreement, but they are merits defenses that go to the enforcement of the contract more generally. And Appelli's answer illustrates that. Their answer in the district court, which this court can find at Record on Appeal 1324 to 1325, and I direct the court prior material breach as affirmative defenses to PolyFlow's claims on the merits, as well as using both release and prior material breach in the form of allegedly firing the neutral pipe expert as a basis for their counterclaim for breach of contract. So, it's clear from their answer that these issues, release and prior material breach, these are merits issues for the arbitrator and not defenses to the making of the arbitration agreement for the court. Ms. Stratton, so let me move back to your first issue for a minute. There, you know, let's assume there's a textual argument in the arbitration clauses for looking at this, your complaint, or looking through to your causes of action or whatever on a piecemeal basis. One of those is a fraudulent inducement to settle. How do you square that with arbitrating the contract? And also, what about the tortious interference claim? How does that arise out of the settlement agreement? So, I'll turn first to the fraudulent inducement claim. It arises out of the settlement agreement for the following reasons. First, under Texas law, a fraudulent inducement claim cannot exist but for the fraudulently induced contract, and it requires the existence of that contract as part of its proof. Our claim is even more dependent upon the contract because in paragraph 80 of our complaint, we allege that it is misrepresentations in the settlement agreement itself that fraudulently induced us to enter the contract. And I'd also direct the court's attention to the following decisions, Prima Paint, Henry Kaplan from the Texas Supreme Court, Gurwell from a Texas appellate court, Sweet Dreams from the Seventh Circuit, as well as this court's own decision in Marlin, which involve broad and narrow arbitration clauses. And the courts held in all of those cases that fraudulent inducement claims were arbitral, whether the clause was broad or narrow. As for the tortious interference claim, Your Honor, these claims are specifically predicated on misrepresentations and omissions that we allege appellees made to third parties about the settlement agreement itself. These misrepresentations and omissions are pled at paragraphs 64 and 68 of our complaint, and they are incorporated by reference into our causes of action at paragraph 70. And you'll also find them incorporated by reference into the tortious breaches of duties imposed by the settlement agreement. The use of our information, the misrepresentation about our relationship is what caused tortious interference with business relationships. And this court has made clear in numerous cases, as have Texas courts, that a breach of contract can involve tortious conduct that gives rise to both breach of contract and tort claims at the same time. That's what's happened here. It's why our tortious interference claim arises out of this contract, because it is generated by appellees alleged breaches of the contract. Do you have any idea why Judge Hoyt disposed of this in one sentence? And I'm looking at the docket. It looks as if there was no oral hearing on the arbitration agreement. So I do not know. That's quite a mystery to us as well, particularly given the strong presumption in favor of arbitration and the broad language here under numerous court precedents. So his summary denial of arbitration is quite a mystery to us, and it's why we're here. I don't know the answer, unfortunately, Judge. I would like to turn and discuss failure of mediation now. Mediation is a question for the arbitrator in nearly all circumstances. This court has found that there's only one rare exception in which the court can decide a procedural prerequisite bars arbitration, and that is when it is clearly established that a procedural requirement is a condition precedent to arbitration and has been breached such that no rational mind could conclude otherwise. That high bar for taking this question of whether mediation is a procedural bar to arbitration has not been, for taking that question from the arbitrator, has not been met in this case because a rational mind could agree with Polyflow that mediation is not a condition precedent or that if it is, it's been either deemed fulfilled or excused by a Pelley's conduct frustrating mediation. And before I tick through those reasons very briefly, I'd like to remind the court that under General Warehouseman and other precedents, this court doesn't need to agree that Polyflow would prevail on any of these points. It need only conclude that a rational mind could agree and that these issues are not clearly established such that it's the arbitrator's province to decide whether mediation is a bar. Mediation is not a condition precedent because it's disfavored under Texas law and I'd note that at brief page 30 of their brief, appellees have reversed course from their position in the district court and they've argued to this court that mediation is in fact not a condition precedent. That seems at least suggestive that a rational mind could agree with Polyflow. The settlement agreement's mediation terms only apply to issues of B1 and B2 compliance. They don't apply to the other types of issues that are in dispute here and even as to B1 and B2, they only apply when the pipe expert has made a determination that the appellees are out of compliance, which appellees concede never happened here. But even if it is a condition precedent, it's been deemed fulfilled by their failure to specifically deny it in their answer. But even most more importantly, it's been frustrated by appellees withholding of their design and manufacturing process information, which is the earlier step necessary to even get to mediation. This court has held that a promisor cannot take advantage of a condition, a failure of a condition that they themselves frustrated. I see my time is ending, so I will reserve the remaining time for rebuttal. Thank you, ma'am. We'll hear from Mr. Schlatter. You're muted. There you go. Thank you, your honor. May it please the court. My name is Steve Slather and I'm representing the appellees here. I think a brief background here will be helpful to understand kind of the context of this settlement agreement. Mr. Wright, one of the defendants in appellees, was the developer of the technology that's kind of at the center of this. He founded PolyFlow. He was its CEO for a time, developed its products during that time. At some point, the parties went their separate ways. Mr. Wright set out to form Specialty RTP, where he remains today, and PolyFlow continued with its business. You've seen reference, and we've discussed it in our brief, that in 2015, PolyFlow brought claims against Mr. Wright and SRTP, and in fact, those claims are largely the same claims they bring now in this case. That suit was ultimately resolved. It was really best described as a nuisance suit, and that's evidenced by the fact that if you look at the settlement agreement, no money changed hands there. The heart of that agreement is sections B-1 and B-2, and those put restrictions on Specialty RTP with regard to what information it can use and what products it could design or manufacture. Mr. Wright and SRTP have never used PolyFlow information, but the agreement provided that there was a mechanism for PolyFlow to confirm on an ongoing basis whether any of SRTP's products did include PolyFlow information. Of particular importance to the RTP was the dispute resolution framework set forth in sections B-4 and B-5 of the agreement, and what those call for is the appointment by an arbitrator of what's referred to as an RTP expert or a neutral pipe expert, and that was a person that was neutral and also knowledgeable about the technology and the products that were involved from both PolyFlow and SRTP, and that framework requires that the pipe expert examine any products that the RTP intended to manufacture or design for a time period and make a determination of whether those products violated section B-1 or B-2 of the settlement agreement, and the reason this framework was set up this way and the reason that there was a neutral expert put in place was because Specialty RTP was particularly concerned that PolyFlow would use this mechanism to discover or learn about Specialty RTP's technology, and so that's why they had this neutral expert in between so that neither party's proprietary information would ever be shared with the other. It would all go to the neutral expert. He would make a decision, and the information would remain separate from the other party. Going forward, the pipe expert, once he made a decision, and as Miss Stratton noted, if the decision was in favor of Specialty RTP, the pipe expert's decision was final. Only if he found that Specialty RTP was in violation would it then trigger a mediation process, and the pipe expert would attempt to mediate that dispute, and only if he was unsuccessful in mediating that dispute did the parties then agree to take that dispute to arbitration, and that is the arbitration provision that you see in section B-5 of the agreement, and it is specifically related to these disputes that may arise in the context of the neutral pipe expert and sections B-1 and B-2 of the agreement, but the important part of that is that the under the guise of policing the agreement. The second arbitration clause here is found in section C-4. It relates only to disputes that arise under the agreement, and that's very clear. I think on that point, the courts are clear, including in the Pennzoil case, that an arbitration clause that uses language such as arising out of is a narrow clause, and the court in Pennzoil contracted that with broad clauses that use language such as arising out of or related to. That's clearly not what we have here under Pennzoil. The clause in C-4 is a narrow one. That's further evidenced by the fact that the clause in C-4 does not even cover all disputes that would arise under this agreement because it's, as I mentioned, the separate dispute resolution mechanism set forth in section B-5 would cover disputes that fall under sections B-1 or B-2 of the agreement. Well, I might agree with you if the provision in B-5C said anything about limited to this agreement or this mechanism, but instead it says, for purposes of clarity, the parties are agreeing that any disputes arising out of or related to this agreement will be arbitrated. Thank you. And going a little further, aren't we required to interpret these provisions harmoniously and not one limiting the other or being limited arbitrarily as opposed to the other one? Go ahead. Well, I think they do need to be interpreted harmoniously. I'm sorry, Your Honor. I think they do need to be interpreted harmoniously, and I think the way that that is done in this case is that you look at the agreement as a whole, and specifically in sections B-4 and B-5, it sets forth this dispute resolution framework that relates to, as I mentioned, the neutral pipe expert and his duties to resolve disputes arising under sections B-1 and B-2. And then if you look, C-4 then would cover anything else. And so, otherwise, if you read section B-5C broadly to cover all disputes that arise under or relate to the agreement, you end up rendering the clause in C-4 a nullity. And that's what the parties intended here was that that agreement or that clause in B-5 would relate to the dispute resolution framework of disputes that arise under the agreement. Well. So, with regard to. What's your best case? What's your best case? With regard to. Yeah, you and I, your transmission is a little slow. I'm sorry. I don't mean to interrupt you. I apologize, and I don't. It does drop occasionally, and I'm not sure why. Well. But I think just the plain reading of the agreement, as you mentioned, requires those two clauses to be harmonized, and the agreement itself makes clear how to do that. It sets forth the framework for dispute resolution under B-1 and B-2 in sections B-4 and B-5. As I mentioned, where you have two competing clauses, and in this case, they don't compete. But if you did try to read them on top of each other, one would just be rendered a nullity, and that shouldn't be the right result here. Further, I believe I understand Polyflow to say that they are seeking arbitration solely under C-4 in this case. With regard to the argument that all claims, if any claim is arbitrable, all claims are arbitrable, and that's Polyflow's argument with the Archer case. Here again, the agreement makes clear that certain disputes, those arising under B-1 and B-2, do not fall under the arbitration clause in C-4. And so at least one category of claims would not go to arbitration even under that, or should not go to arbitration under section C-4. That's not what the parties agreed to. They agreed to have two separate arbitration provisions covering different aspects of the agreement. So is it your position that you want part of this dispute arbitrated and part of it submitted to the federal court? Well, we believe all the claims should properly remain in front of the court, and that none of them are arbitrable. Well, you just said that B-1 and B-2 are arbitrable. They are, and that goes to whether certain conditions are met. And as we describe in our briefing, those conditions just simply haven't been met. There's a framework, and it requires the appointment of an MPE by an arbitrator. That was done. It requires the pipe expert to then examine SRTP products to see if they are in violation of sections B-1 or B-2. He's done that. In this case, he has not found a violation. And therefore, under the terms of the agreement, that's the end of that inquiry. However, if there was a case where he found SRTP to be in violation, only then, if he was not able to mediate that dispute, would that specific dispute go to arbitration under the provision in section B-5? Well, I mean, they assert that a number of their claims are based on disclosures of information by specialty RTP contrary to the settlement agreement, interference with customers of Polyflow and Lanham Act violations. And it seems to me all of those are reasonably read as being governed by the settlement agreement. So why are they not arbitrable under C-4? Well, if we look at the Ford case, for example, the test for whether tort claims arise or relate to the agreement is whether those claims could stand alone. And so, certainly, the Lanham Act claims, which relate to trademark trade dress largely, those claims could certainly stand alone here. The existence of the agreement is not required to go forward with those claims. With regard to tortious interference, it's the same. The activities that Polyflow complains about, which was disclosing information to certain customers, setting aside that that may not even fall under the Lanham Act because it doesn't relate to goods or services, that that pause of action would stand alone. It does not require the existence of the contract. And the same is true with regard to the fraudulent inducement claims. And if we look at the Ford case, it addressed fraudulent inducement, Lanham Act claims, and tortious interference claims. And in each of those instances, it found that they did not relate to the underlying agreement, did not require the agreement. And in that way, they stood alone and were not arbitrable. And I will point out in that case, that did involve a broad arbitration provision that covered any claims arising from or related to the agreement, which is not what we have here. We have a narrow provision that only covers claims that arise from the agreement. And so, with regard to Lanham Act, fraudulent inducement, tortious interference, they simply just don't arise from the agreement. They stand alone under Ford. Why is it that your client decided not to do arbitration? Ortho is a certain, in this case, a number of claims that were, that it previously released in the earlier case. And we've provided a comparison of those claims. And you'll see that most of them are largely identical. In fact, in the first amended complaint, Polyflow makes clear that it's relying on activity that occurred before the settlement specifically sets out, before the settlement agreement, and then provides a kind of laundry list of bad acts that it claims SRTP is guilty of. And further, in the counts themselves, it refers to activity involving Exxon. Both of those were part of the 2015 loss. And so, we don't want a whole case, and we think they should be resolved in federal court, not in front of an arbitrator. They simply do not arise out of this agreement. I mean, if we look at what the parties agreed to arbitrate, and that's really the focus here, what did the parties agree to arbitrate? It's very clear. They agreed to arbitrate only those disputes that arise out of the agreement. And that's the word is action. The word is action. And in this case, we contend that action means a claim or a cause of action. And we have addressed the Archer case in our response to Polyflow's supplemental authority. And that's further underscored by the party's definition of a claim in this case, where it defines claims synonymous with action, where the parties wanted to refer to an entire litigation. They did so. For instance, they refer to the 2015 litigation, or they refer to it as a civil action. In this case, action should be construed to mean cause of action. And that's further underscored by the fact that to read action as the entire action in C-4 would then render any claims that arise under B-1 are required to be arbitrated. Perhaps at some point under Section B-5, it would render that a nullity, and that shouldn't be the result here. The going back to two issues with regard to the release claims, I understood Polyflow to argue that that is an issue for the arbitrator. It's simply not. In this case, those claims, the released claims that are now included in Polyflow's current complaint were released in the same agreement that the arbitration clauses are found. And so, those claims are not something that the parties agreed to mediate. It perhaps could be a different result if the release claims were in a different agreement or something along those lines. But here, they were released in the very same agreement. So, it makes no sense that the parties would have agreed to release those claims, but still agree to arbitrate them at some point in the future. With regard to the failure to mediate, the framework in Section B is very clear that if Polyflow believes that SRTP is in violation, it can raise that issue with the neutral pipe expert, and then he will go forward with his analysis and mediation if necessary to resolve the dispute. SRTP has complied with every request from the pipe expert with regard to providing products. So, for examination, products and information. So, to the extent that Polyflow claims that there are products that it believes are in violation, but SRTP has not turned over, that is the result of Polyflow not raising that issue with the neutral pipe expert in the first instance. I see I am out of time. Yes, sir, you are out of time. We'll go back to Ms. Stratton for rebuttal. Thank you, Your Honor. I'd like to begin with the issue of mediation. You've heard opposing counsel describe their view of why mediation was a prerequisite here, and we obviously vehemently dispute that, and that's precisely why the issue is not clearly established such that this court could decide it because no rational mind could do anything but agree with Mr. Schlatter's position. He's not articulated why it is clearly established and essentially undisputed here that a procedural prerequisite was breached. So, all of his arguments about what should have been done in the mediation process, that's all for the arbitrator to decide under this court's procedural arbitrability precedence. I'd like to also briefly discuss the issue of release. Appellees appear to be trying to take the issue of release and frame it as a question of what the parties agreed to arbitrate, a question of substantive arbitrability. But this court has made clear that it does not consider the merit in its substantive arbitrability determination. You said that in Chevron Chemical, you said it in Bank One v. Hill, and in numerous other cases. And what Mr. Schlatter's argument does, by asserting release as a question of the scope of the arbitration agreement, is inject the merits into the substantive arbitrability determination. For this court to decide whether Polyflow sued on released claims, it would have to resolve the merit. That is a basis for the court in a substantive arbitrability analysis. Release is a defense. That's how this court should treat it, and that's exactly how Mr. Schlatter's answer on behalf of Specialty RTP in the district court treated it, as an affirmative defense on the merits, a basis for their merits counterclaim, and therefore, it's properly submitted to the arbitrator as part of the underlying merits of the dispute. Now, I'd like to move on to addressing the interaction between C4 and B5. There is a way to harmonize these provisions, to read them quite naturally, in a way that doesn't treat them as two separate arbitration provisions or treat them as a limitation on one another. First, there is nothing in the text of either C4 or B5C that suggests that they apply to anything other than the entirety of the agreement. There is no limiting language, as Judge Jones noted. And the most natural reading we submit of B5 is that it is inserted to protect the breadth of the party's arbitration agreement, because it appears in a section laying out certain procedures for resolving certain types of disputes under the agreement, and it heads off the potential argument that by laying out those procedures, these were the only substantive claims the clarifying that we are agreeing that any dispute arising out of or related to this agreement shall be arbitrated. And so, in C4, you have an extraordinarily broad arbitration provision. In B5C, you have another extraordinarily broad arbitration provision, and broad plus broad equals broad. It does not, as Mr. Schlegler contends, equal narrow, and it does not equal arising under, which is what he said at the beginning of the argument, that we agreed in C4 to arbitrate arising under. This court made clear in XFLOW that arising out of and arising under are not the same, and that arising out of is a broader arbitration clause than the more narrow arising under. It's Mr. Schlegler's burden to furnish this court with positive assurance that this arbitration agreement cannot be read to cover this action. And in order to meet that burden, appellees have had to rewrite the arbitration language to arising under and call arbitration clauses that this court and others have repeatedly called broad, narrow, insisting upon that. And our opinion, your honors, is that that doesn't amount to positive assurance that these claims are not arbitrable. I'd also like to briefly distinguish Ford, which Mr. Schlegler relies upon. In Ford, the court made it clear that when a tort claim is based upon a breach of contract, it's arbitrable. There, there was no breach of contract claim in the case. The parties could have completely complied with their obligations under the contract and the tort claim in that case would still have proceeded. That's why the Ford court was able to say this contract is legally irrelevant to this tort claim. We can treat it like it doesn't exist. That's not possible here. For example, Mr. Schlegler asserts that the Lanham Act claims have nothing to do with the settlement agreement, but I'd refer the court to paragraphs 96 and 114 of our unfair competition claims, which are based specifically upon appellee's misrepresentations about the terms and scope of the settlement agreement itself. The fact finder simply could not resolve those claims without consulting the terms and scope of the settlement agreement, and they arise under, out of the contract. Thank you. All right. Thank you very much. That concludes our brief hearing for today, and we'll take the case under advisement. Thank you.